ANDREAS GUBASKO, Appellant, *against* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Respondents.

(Decided June 25th, 1883.)

At the trial of an action against the city of New York to recover damages for injuries to plaintiff caused by a tree falling upon him while passing on a sidewalk of that city, it appeared that several years previously the top and branches of the tree had been cut off, leaving the trunk in a decaying condition; that it stood on the sidewalk, fifteen inches from the street, which was a narrow street in the business part of the city, having a railway through it, for the cars of which other vehicles were compelled to make way; and that the fall was caused by the shock received from a

load of timber upon a passing truck sliding against the tree as the truck was turning out to allow a street car to pass. The evidence was conflicting as to the degree of force with which the tree was struck, and as to whether it was broken off, or merely split by the blow and fell; and was doubtful as to the outward appearance of the tree. *Held*, that a dismissal of the complaint, on the ground that no negligence on the part of the city authorities was shown, and that, as matter of law, the occurrence of the accident arose from an unusual cause which could not have been anticipated, was error; and that the question should have been left to the jury.

APPEAL from a judgment of this court entered upon the dismissal of a complaint.

The facts are stated in the opinion.

*Thomas G. Shearman,* for appellant.—The accident was of a nature which could be easily foreseen by any one accustomed to the course of business in the city. The utmost extent to which the courts have gone in exempting parties from responsibility for injuries caused by their omission to take precautions, is to relieve them from liability where the accident was so extremely unlikely to occur, that no reasonable man could have believed it possible had his attention been called to the risk in advance (*Greenland* v. *Chaplin,* 5 Exch. 243). The injury in this case was caused by an event which any reasonable person could easily have anticipated, to wit, the projection of a truck load for more than fifteen inches beyond the edge of the curbstone.

But whether the projection of a truck load for more than fifteen inches, as in this case, was an event which could have been anticipated or not, the defendants would nevertheless be liable if the tree was in a rotten condition, and would have fallen in consequence of a blow from any source which might have been reasonably anticipated (Wharton Negligence, §§ 16–21 ; *Ring* v. *Cohoes,* 77 N. Y. 83, 88, approving *Baldwin* v. *Turnpike Co.,* 40 Conn. 238 ; *Hull* v. *Kansas City,* 54 Mo. 601 ; *Hunt* v. *Pownal,* 9 Vt. 411 ; *Winship* v. *Enfield,* 42 N. H. 197 ; *Hey* v. *Philadelphia,* 81 Pa. St. 44 ; *Sherwood* v. *Hamilton,* 37 Upp. Can. Q. B. 410 ; S.

P., *Kennedy* v. *Mayor &c. of New York*, 73 N. Y. 365; and see *Lynch* v. *Murdin*, 1 Q. B. 36).

But whatever view may be taken on the question of extraordinary cause, the court below erred in taking away the question from the jury. It was for the jury, not for the court, to decide whether, in the ordinary course of traffic in this city, a cart might be expected to carry timber projecting beyond its end. In every case where the question of extraordinary and unanticipated causes has arisen, the courts have directed the question to be submitted to the jury (*Ward* v. *Atlantic &c. Tel. Co.*, 71 N. Y. 81; *Gregory* v. *Adams*, 14 Gray 242; *Wilson* v. *Granby*, 47 Conn. 59).

*E. Henry Lacombe*, for respondents.—The city authorities are not chargeable with negligence in allowing the stump of the tree to remain where it stood, unless it was visibly and obviously unsafe (*Hume* v. *Mayor*, 47 N. Y. 639, and 74 N. Y. 273; and see *Seaman* v. *Mayor &c. of New York*, 80 N. Y. 239; *Garrison* v. *Mayor &c. of New York*, 5 Bosw. 497; *McGinity* v. *Mayor &c. of New York*, 5 Duer 674; *Hart* v. *Brooklyn*, 36 Barb. 226; *Smith* v. *Mayor*, 15 Week. Dig. 103; *Scanlon* v. *Mayor*, ante, p. 81).

There rested on the defendant no obligation to remove the tree as being too weak to resist the blow to which it succumbed. The rule which, it is contended, is controlling of this branch of the case, is tersely and forcibly expressed in an opinion by the late Judge CHARLES P. SANFORD, when discussing an instance of alleged contributory negligence: "The vigilance and caution to be exercised in avoiding disaster should not necessarily be commensurate with the danger that is imminent, but with the danger that is to be apprehended" (*Cornwall* v. *Mills*, 44 N. Y. Super. Ct. [12 Jones & Sp.] 50; and see *Ward* v. *Atlantic &c. Tel. Co.*, 71 N. Y. 84; *Allen* v. *Atlantic &c. Tel. Co.*, 21 Hun 22. Somewhat analogous cases are *Cleveland* v. *New Jersey Steamboat Co.*, 68 N. Y. 306; *Loftus* v. *Union Ferry Co.*, 84 N. Y. 455).

There was no such conflict of testimony as would pre-

clude the court from deciding the legal questions arising upon that testimony.

CHARLES P. DALY, Chief Justice. — I think the case should have gone to the jury. The judge at the trial held that no negligence was shown on the part of the city authorities. The tree, he said, was broken or split off by the shock it received from the truck; and as it stood on the sidewalk, fifteen inches from the street, he did not think that he could hold that such a blow from the wagon was an exigency which, in the ordinary course of events, could be expected. This, I think, was a question for the jury and not for the court, for it involved, in the first instance, a finding of facts in respect to which the evidence was more or less conflicting. This was the case with respect to the degree of force with which the tree was struck by the truck.

The driver said he did not even feel the force of the blow; that he did not know what had taken place until he heard some one shouting; that he was sitting on the timber with which the truck was loaded, and that the load was not a heavy one.

Miller said that the timber did not strike the tree with force; that the wagon only slipped off the horse car track; the truck hit the tree hard, but that he did not take much notice.

Ennis, on the contrary, testified that the lumber struck the tree a pretty good blow—rather heavy: and the force of the blow was certainly to be considered in determining the extent to which the tree had become decayed or in such a condition as to impose upon the public authorities the obligation of removing it to prevent the possibility of injury to passers by should it be broken off and fall by a blow from a cart or other object.

Hogg, the expert, testified that it would take a blow equivalent to the force of fifty tons to break off a tree of its diameter if it was solid, and from the evidence as to the manner in which it was struck by the timber projecting

from the end of the truck, he computed that it was struck with a force about equal to ten tons.

There was some conflict also as to whether the tree was broken off or merely split by the blow, and fell. Hernberg says it broke off about two feet from the sidewalk; but that he did not notice whether it was above or below a hole in it, which was three feet above the sidewalk. Tripler speaks of it as having been broken off; whilst the defendant's witness, Craig, says that it did not break off short; that he looked at the fallen tree, after the accident, and that there was a split in it, which extended about thirty inches on both sides. To this evidence of Craig's, the expert Hogg attached some importance, for, in reference to it, he said: "If a tree splits, it shows that the wood was very sound."

There was doubt or uncertainty, moreover, in the evidence, as to the outward appearance of the tree. Reddy, when cross-examined, testified that before it fell it looked sound enough, but, on the re-direct, said that he did not mean to say that, when the tree was standing, before it fell, it presented a sound appearance on the outside. He gave this answer in reply to a question put, and then added— before the tree fell, it did not present a sound and healthy appearance. It stood up a bald and bare trunk, with no appearance of life or growth; as a lifeless, limbless, dead tree; and had been standing in that condition for six or seven years; and what weight was to be attached to all of the above evidence was for the jury, and not for the court, to determine; and even upon the uncontroverted facts, the question involved was one upon which different minds might come to a different conclusion.

It was an ailantus tree, which had been cut off at the top, with all the branches, about eight years before the accident, to make way for the building of the elevated railroad in the street, leaving a stump or boll of the tree standing to a height of about nine feet above the sidewalk. At the time it was cut off it was a vigorous tree, in full growth, that had been planted there many years before.

The expert, Hogg, testified that such a tree cut off at the

top, in full vigor, would probably take ten, twelve or fifteen years to rot away; and in rotting, it would rot away from the top and gradually crumble off, or pieces might crumble off, but would not tumble down in a whole column, unless broken by a blow, or something of that kind, or by being pulled down; and that, from the condition of the fragments shown him, he should judge that the decay in this stump was working downwards, the top part being more decayed than the bottom.

The police officer, who had been ordered, in 1876, to report all the dead trees, did not report this, because it had sprouts a foot or two long. He saw these sprouts in 1878, and saw the tree every day from that time to 1881, but did not see any shoots after 1878; and the expert, Hogg, testified that a large part of the tree might be dead, and a small portion might send forth shoots. That this stump, nine feet high, was, at the time of the accident, very much decayed in the interior, was shown by several witnesses, and instead of being limited to the top, this decay existed far down in the tree, and within three feet of the sidewalk; for, at that point, on the south side of it, there was a hole, thirteen inches in diameter and about five inches deep, which had been there for six or seven years. And it was in testimony that if a hand were thrust into this hole it would come out covered with dust. Reddy testified that it was clearly to be seen, on examination, that the inside of the tree was rotten, decayed. And Tripler said that outside the tree showed the bark and was not rotten, but that the inside of the tree was all gone; that it was all punk and dust; that when it fell it was a dead tree; that immediately after the accident he examined the fallen tree and found it very rotten.

Several of the defendant's witnesses testified to its appearance before it fell. Ennis said that, from the appearance outside, it was a solid tree, only that the hole was there; that if you looked at the tree it looked pretty solid, but that he never examined the tree; that all that he knew was that there was a hole on the south side of it. He could

not tell how it looked inside, because it looked pretty good outside.

Clossy, who passed it four or five times a day for about thirty years, said that it looked sound to all outside appearance; but, though having passed it so frequently, he did not know that there was a hole in it such as has been described, and did not think there was; but added: "I did not take much notice."

There being conflict or uncertainty as to the facts, the case should have gone to the jury, for they alone could determine, under proper instruction, whether the condition of this stump of a tree nine feet high was such as to require the city authorities, in the proper exercise of that care of the public streets which the law imposes upon them, to remove it to prevent the possibility of accidents to passers by by the fall of it. It no longer served the purpose for which the tree had been planted—to shade the sidewalk in the summer. It was an unnecessary incumbrance after it had become a bare stump, and especially so in this part of Greenwich Street, which is in the business section of the city, close to the river and the Battery—an old and narrow street, being less than sixty feet wide, with sidewalks twelve feet wide, and a road or street way of only thirty-four feet in width—the use of which as a thoroughfare for carts, trucks and vehicles in that portion of the city has become more limited by changes that have taken place since the tree was planted, there being now a city railroad track through the street and an elevated railroad above it supported by posts or pillars from below. The driver of the truck, who was manifestly, from the testimony, free from all blame, testified that when he had to turn out to let the street car pass, the street at that point was narrow, and that there was not space enough for a truck, such a one as he drove, entirely on the outside of the railroad track; that he felt his wheel slide on that side of the street; that the rail of the track lies near the sidewalk; that the track itself rises above the pavement, and that there is quite a gully between the track and the street, making it, as he

said, " hard for a truck ; that it had to bend—slide along;" that he was striving to get out of the track as carefully as he could, and was not driving fast, which he could not do with such a load.

These circumstances—the peculiar condition of this part of Greenwich Street, the fact that what remained of the tree had been lifeless and dead for five or six years ; that it served no use or purpose to allow a lifeless stump of such a height to remain there ; that in the situation it was in it would naturally decay, and was at the time of the accident decayed in the interior, or as Tripler expressed it, " that the inside was all gone, all punk and dust; " that it split or broke off with the pressure of a loaded cart against it— presented the question, whether it was not the duty of the public authorities to have examined and known the condi- tion of such a useless object in the street, for (in the lan- guage of one of the witnesses) " it was clearly to be seen on examination that the inside of the tree was rotten and decayed," and to have removed it. The fact that it stood fifteen inches from the road bed of the street was regarded by the judge as a circumstance showing that a blow from a wagon was an exigency that, in the ordinary course of events, was not to be expected. But this was a point upon which different minds might come to different conclusions. It is not an unusual circumstance for carts in traversing the business streets of a city to have boards or timber project- ing more than fifteen inches beyond the end of the cart or further, and as the space for turning a vehicle to enable a railroad car to pass in this particular part of Greenwich Street is very narrow, such an exigency as a cart striking the stump does not appear to me to be one which in the ordinary course of events could not have been expected. It appears to me, on the contrary, that in view of the narrow- ness of the space and the positions of the track and of this stump, the possibility of a cart coming in collision with the stump in turning for a railroad car to pass was one that ought to have occurred to those whose duty it is to attend to the condition of the public streets, and who see or ought

Gubasko v. Mayor &c. of New York.

to know, especially in business streets, what is taking place
in them in the transportation of merchandise to or from
different streets, or to and from the piers and wharfs ; and
as I find myself in this respect differing from my colleague,
it shows that this is one of those questions that should be
left to the twelve minds in the jury box, rather than to
a single one upon the bench.   It is a question which a
jury composed of persons living in the city, and who are
acquainted with the public streets and the daily use that is
made of them, are quite as competent to determine as the
court.   Indeed, having this experience to aid them, their
united and unanimous judgment in the disposition of such
a question is, in my opinion, entitled to greater weight.  For
this reason, I think the case should have gone to the jury,
under proper instruction, to determine whether the public
authorities should not have examined the condit of the
stump ; or, if they had, should not have removed pre-
vent the possibility of such an accident as in this case it
was the cause of.

As matter of law it does not, in my opinion, come within
the class of cases in which it has been held that the occur-
rence of the accident arose from one of those unusual
causes which could not reasonably have been anticipated ;
such as the breaking down of telegraph poles by a violent
storm of unusual severity, as in *Ward* v. *The Atlantic &c.
Tel. Co.* (71 N. Y. 84) ; or where the proximate cause of
the breaking down of a telegraph pole was not any insuffi-
ciency in the strength of the pole, but a collision caused by
a runaway team of horses with a wagon attached, as in
*Allen* v. *The Atlantic Tel. Co.* (21 Hun 22) ; or the heedless
and unthinking rush of passengers, under great excite-
ment, against the rail and stanchion of a steamboat, by
which the party injured was pushed through the gangway,
the gate of which had been wrongfully opened by an unau-
thorized person, as in *Cleveland* v. *The New Jersey Steam-
boat Co.* (68 N. Y. 306) ; or the loss of a child, by his getting
through the opening in the guard of a ferryboat and falling
into the water, between the bridge and the pier, as forty

millions of people passed annually over the ferries and no such accident had ever occurred as a person falling through the spaces in the guards, as in *Loftus* v. *The Union Ferry Co.* (84 N. Y. 455).

In *Hume* v. *The Mayor &c. of New York* (74 N. Y. 264), it was held to be the duty of the city to have known that an awning which fell from the weight of snow upon it was held by the fastening of the rafters to the side of the building by what is known as toe nailing, an improper and insecure way of fastening, as the manner in which the awning was fastened was visible from the sidewalk; and for this neglect on the part of the city authorities, in that case, they were held responsible for an injury occasioned by the falling of the awning, because it projected over a part of the street, and was therefore subject to their supervision and control.

If this degree of vigilance was required in that case as a matter of law, I think it was certainly a question in this case whether it was not the duty of the city authorities to know the state in which this dead and decaying stump was, which could have been easily ascertained by simply examining it. It was not like an occasional object in the street, or like the covering of a vault in the sidewalk carelessly left open. It was a permanent object that had remained for five or six years in the street, lifeless and dead, and which during the whole of that time had a large hole in it. It served no public or private purpose to remain there, and being naturally in a state of decay, in a narrow street in the business part of the city, where vehicles using the street as a thoroughfare had to make way for the regular passage of railroad cars, a fair question was presented for the judgment of the jury whether it was not the duty of the city authorities to have ascertained the actual condition of this stump of a tree, and if, upon examination, it was found to be in the state described by the witnesses, to have removed it. If it was as rotten in the interior as they testified, from the top to within a few feet of the sidewalk, it was liable to be broken and fall, as it did, by the backing

of a cart in that narrow space, or other object coming against it, and, being nine feet high, there was the danger that, by the sudden fall of so large an object, it might strike a person passing on the sidewalk.

Baron POLLOCK thought, in *Greenland* v. *Chapin* (5 Exch. 248), that the rule of law is that a person is expected to anticipate and guard against all reasonable consequences, but not against those which no reasonable man could expect to occur. And whether this did or did not constitute such an exception should, in my opinion, have been left to the judgment of the jury.

I think therefore that the judgment should be reversed and a new trial should be granted, with costs to the appellant to abide the event.

BEACH, J., concurred.

Judgment reversed and new trial granted, with costs to appellant to abide event.